UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KHADIJA SHABAZZ,

    Plaintiff,

v.

Case No. 10-12066

Paul D. Borman
United States District Judge

SAFE HORIZONS,

    Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 39)

This matter is before the Court on Defendant's Motion for Summary Judgment. (Dkt. No. 39.) Plaintiff filed a response (Dkt. No. 44) and Defendant filed a reply (Dkt. No. 54.) The Court held a hearing on August 25, 2011. For the reasons that follow, the Court GRANTS Defendant's motion and DISMISSES Plaintiff's Complaint with prejudice.

**INTRODUCTION**

Plaintiff worked as a court advocate for Defendant Safe Horizons, a non-profit agency located in Port Huron, Michigan, St. Clair County, providing assistance to victims of domestic abuse, from June 4, 2007 until her termination on April 21, 2009. Safe Horizons is funded primarily by the Michigan Domestic Violence Prevention and Treatment Board (MDVTVB). The agency's purpose is to advocate for victims of domestic violence located in St. Clair County. (Def.'s Mot. Ex. B.) Plaintiff claims that she was being "harassed" and "nitpicked" by her immediate supervisor, Kathy

1

Berry, for reasons unrelated to Plaintiff's race or religion. Plaintiff claims that when she met with Safe Horizons' Executive Director, Jenny Schultz MacReady, about this "harassment" and "nitpicking," Ms. MacReady learned from Plaintiff that Plaintiff was of the Muslim faith, allegedly made a disgusting face and began to treat Plaintiff differently, ultimately terminating Plaintiff's employment.

Defendant responds that Plaintiff was terminated due to significant performance issues and insubordination. Plaintiff filed a claim with the Equal Opportunity Employment Commission ("EEOC"), received a right to sue letter, and filed this action on May 21, 2010, alleging race and religious discrimination pursuant to Title VII and the Michigan Elliot-Larsen Civil Rights Act. Defendant has now filed the instant motion for summary judgment. For the reasons that follow, the Court will GRANT Defendant's motion.

I.  **BACKGROUND**

Plaintiff began her employment with Safe Horizons on or about June 4, 2007. (Dkt. No. 57, Notarized Affidavit of Jenny Schultz MacReady, June 29, 2011 ¶ 3.) Plaintiff worked as a court advocate for victims of domestic abuse, interacting with prosecutors, police and the judiciary on behalf of Safe Horizons and Safe Horizons' clients. (*Id.*) Plaintiff's direct supervisor at Safe Horizons was Kathy Berry. (*Id.*) The general duties of a court advocate for Safe Horizons included the following: accompanying survivors of domestic/sexual assault to hearings and meetings within the criminal justice system; assisting clients with developing safety plans and acting as their advocate with other agencies and organizations; maintaining and submitting all required documentation and monthly statistical data reports; assuring the best possible client utilization of agency services by adhering to Safe Horizons' policies and contracts with funding sources; performing other duties as

assigned by the Program Manager. Plaintiff was an at-will, hourly, non-exempt employee. (Def.'s Mot. Ex. B, Court Advocate Job Description.)

According to Plaintiff's immediate supervisor, Ms. Berry, and the executive director of the Safe Horizons program, Ms. MacReady, there were many instances of discipline and performance problems that punctuated Plaintiff's employment history and that ultimately led to her termination. For example, on June 26, 2008, after receiving a complaint from a Safe Horizons' employee that Plaintiff had mistreated her in the workplace, Ms. MacReady met with Plaintiff, who conceded that she had acted unprofessionally and inappropriately toward the complaining fellow employee. (MacReady Aff. ¶ 5(a); Deposition of Khadija Shabazz, December 16, 2010 294:20-295:13.)

On November 24, 2008, Ms. Berry met with Plaintiff to evaluate Plaintiff's work performance. The written Performance Evaluation, which was presented to Plaintiff at the November 24, 2008 meeting, noted several areas where Plaintiff's performance was deficient and needed improvement. (Def.'s Mot. Ex. D, Performance Evaluation.) The following are some of the problem areas that were noted: accountability (holding self responsible for understanding and meeting expectations without blaming others); supporting the functioning of her supervisor; completing all required documentation; managing time and completing all tasks; keeping supervisor informed with timely, accurate and complete reporting; maintaining a well organized working environment. (*Id.*)

Specific comments regarding Plaintiff's performance issues included: Plaintiff argued with her supervisor regarding making client files available for supervisory review; Plaintiff's files, on a random inspection, were lacking in organization and completeness; Plaintiff was overly-aggressive in certain communications; other agency representatives complained that Plaintiff was difficult to

reach and did not return phone calls. Specific goals set for Plaintiff moving forward were: (1) to catch up on file maintenance by December 5, 2008; (2) to utilize volunteer assistance; (3) to return calls and emails within one business day; (4) to continue professional development. (*Id.*) Specifically, the Performance Evaluation noted that Plaintiff needed to improve her performance by: (1) following supervisory directions, i.e. utilizing the sign-in board, (2) not meeting with external clients in the crisis office, (3) emptying her message bin so as to be aware of new incoming messages and (4) voicing concerns to supervisor in a timely manner before frustrations build. (*Id.*)

Plaintiff signed the Performance Evaluation but marked several items which she disagreed that she needed to improve. (*Id.*) Plaintiff testified, however, that she never actually read the entire evaluation because she was offended by the number of areas that were noted as needing improvement. (Shabazz Dep. 277: 9-280:23.) Plaintiff acknowledged that the November 24, 2008 Performance Evaluation that she signed specifically noted that during a random check of her files, they were found to be unorganized and incomplete but Plaintiff denied that she was made aware at the time of the meeting that there was a problem with her record keeping because she quit listening when she "saw the 4's." (*Id.* at 297:10-299:22.) Plaintiff testified that she walked out of the meeting and never read the document. (*Id.* at 299:25-300:14.)

Although Plaintiff claims that the Performance Evaluation contained "lies," in fact she conceded that many of the items noted had in fact occurred. She brushed these off, however, as examples of Ms. Berry just being a "nitpicker." (*Id.* at 300:10-309:24.) For example, Plaintiff admitted that she did not always fill out client forms (such as HIPAA notices) at the required time, i.e. at the time of first intake, because she felt that other things, such as calming the client, were more important. In fact, as to some clients, Plaintiff testified that she never obtained all of the required

4

forms. (Shabazz Dep. 254:8-258:12; 263:24-265:7.)

Plaintiff also conceded that on one occasion, just before the Safe Horizons' files were going to be audited, Ms. Berry went through Plaintiff's files without Plaintiff's permission. Plaintiff complained to Ms. MacReady, who told Plaintiff that Ms. Berry had the right to review Plaintiff's files anytime she wanted. (*Id.* 265:8-266:15.) Plaintiff admitted that she took offense at Ms. Berry, her immediate supervisor, going through her files and complained that Ms. Berry was just "nitpicking" for no good reason. (*Id.* 267:20:268:18.)

In early February, 2009, following the instance of Ms. Berry looking through Plaintiff's files, there was a scheduled audit of Safe Horizons' files by the agency's primary funding source, the MDVTVB. Plaintiff was informed that the auditor "was very disappointed with [her] records." (*Id.* 271:20-272:24.) Plaintiff also admitted that Ms. Berry "got after her" about not returning messages, which Plaintiff also dismissed as more "nitpicking." (*Id.* 303:23-306:9.) Plaintiff also recalled there was an issue with her posting her comings and goings by signing in and out on the office board. Plaintiff testified that she was told to sign in and out every day, but that it wasn't always possible. She felt that this requirement was counterproductive and unnecessary. (*Id.* 306:10-17; 323:6-324:325:1.) Plaintiff also testified that she had no intention of changing her record keeping habits, which she kept in the manner that she claims to have learned from her predecessor. (*Id.* 320:22-25.)

As a result of all of what Plaintiff termed "nitpicking," Plaintiff requested a meeting with Ms. MacReady to complain about Ms. Berry's demands on Plaintiff. (*Id.* 313:14-21.) Plaintiff was unclear about how many meetings she had with Ms. Berry and Ms. MacReady, or with Ms. MacReady about Ms. Berry, but the meeting that sticks out in her mind, which was around the November "nitpicking" time, is one in which Plaintiff claims Ms. MacReady made the "disgusted

face" that is the basis for Plaintiff's lawsuit. (*Id.* 316:2-317:16.) Plaintiff testified that during the meeting with Ms. Berry and Ms. MacReady, Plaintiff disclosed that she was a Muslim and that, upon learning this fact, Ms. MacReady allegedly made a face of "disgust" and the whole tenor of the meeting changed. Plaintiff could not recall that Ms. MacReady actually said anything about Plaintiff's faith, only that she gave a look of disgust. (*Id.* 325:12-327:18.) Although asked repeatedly at her deposition what Ms. MacReady said or did to make Plaintiff feel she had been discriminated against, Plaintiff could only point to that meeting, and specifically, that look of disgust, as the turning point in her job.[1] Plaintiff never mentioned to Ms. Berry or anyone other than family that she felt that Ms. MacReady had discriminated against her because of her Muslim faith. (*Id.* 330:25-332:9.)

Ms. MacReady's recall of events is similar to Plaintiff's, although more specific as to the timing of certain issues. Ms. MacReady states that Ms. Berry reported to her that at her November 24, 2008 Performance Review, that Plaintiff had refused to discuss the review, acted dismissive and appeared not to listen as Ms. Berry attempted to explain the areas in which Plaintiff needed to improve. (Dkt. No. 57, MacReady Aff. ¶ 5(b).) Ms. MacReady stated that following the November 24, 2008 meeting between Plaintiff and Ms. Berry, Plaintiff requested a meeting with Ms. MacReady and Ms. Berry to discuss the criticisms and directives contained in the Performance Evaluation. Ms. MacReady states that at the meeting among the three of them, Plaintiff acted with disregard for Ms.

---

[1] At oral argument on Defendant's motion, Plaintiff contradicted this testimony, stating that Ms. MacReady said something like "well that explains a lot - that explains why you are so cocky." Plaintiff cannot create a genuine issue of fact by making statements after a motion for summary judgment has been filed that contradict her earlier deposition testimony. *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986) ("A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony."). Indeed, in the instant case, no sworn affidavit was filed.

6

Berry's authority and dismissed Ms. Berry's directives as "nitpicking." (*Id.* ¶ 5(c).) Plaintiff demonstrated an unwillingness to work with Ms. Berry and requested that she be able to report directly to Ms. MacReady. Ms. MacReady explained to Plaintiff that she needed to continue to follow the chain of command and continue to report to Ms. Berry. (*Id.*)

On February 11, 2009, in preparation for the upcoming MDVTVB audit, Ms. MacReady and Ms. Berry reviewed Plaintiff's files and found that they were severely deficient and would not pass the audit. (Dkt. No. 57, MacReady Aff. ¶ 5(e).) Ms. MacReady determined that it was necessary to postpone the audit, to which MDVTVB agreed, upon stipulation that Plaintiff be put on a Performance Improvement Plan to address the issue of her deficient files. (*Id.*; Def.'s Mot. Ex. H, Performance Improvement Plan ("PIP").) On March 9, 2009, Ms. MacReady met with Plaintiff to explain and implement the PIP, which Plaintiff signed. Ms. MacReady recalls that Plaintiff displayed "a disregard for the funding risk created by her deficient files." (*Id.* ¶ 5(f).)

Ms. MacReady also states that she had to address another instance of Plaintiff's inappropriate conduct at a department meeting in late November, 2008, at which Plaintiff had been rude and disruptive and had challenged Ms. Berry's directives in front of department employees. (*Id.* ¶ 5(d); Def.'s Mot. Ex. G.) Plaintiff does not deny this allegation in her response and does not discuss such an instance in her deposition.

In early March, 2009, Plaintiff requested permission from Ms. MacReady to drive a long distance to Kalamazoo to attend a trial with two clients. Ms. MacReady denied the request due to funding restrictions and directed Plaintiff to transfer the clients to a Kalamazoo area agency. Ms. MacReady assumed that Plaintiff did as instructed. (*Id.* ¶ 5(g).) Plaintiff admits that she was told sometime in March that due to funding restrictions, she was to find someone local to Kalamazoo to

handle the trial. Plaintiff testified that when she finally arranged for someone local to take the case, it was the day before trial (April 13, 2009) and the prosecutor was furious about making the advocate switch the day before trial in Kalamazoo. (Def.'s Mot. Ex. A, Shabazz Dep. 197:11-208:3.) Plaintiff then contacted Ms. Berry to tell her that the Kent County prosecutor in Kalamazoo was furious about the switch. (*Id.* 212:5-212:25.) Ms. Berry told Plaintiff that she would call Ms. MacReady and get back to Plaintiff. Ms. Berry called Plaintiff the next day and told her to go ahead to Kalamazoo and that she would be "dealt with" when she returned. (*Id.* 213:1-214:24.)

Ms. MacReady recalls that she declined a request from Plaintiff on the eve of the Kalamazoo trial to "change her mind" and let Plaintiff go to Kalamazoo. Later that same day, Ms. MacReady received a call from the prosecutor expressing anger and frustration toward Safe Horizons for the last minute switch and stating that the clients did not want to go forward without Plaintiff. (Dkt. No. 57, MacReady Aff. ¶ 5(h).) Consequently, Ms. MacReady told Ms. Berry to tell Plaintiff to attend the trial in Kalamazoo and to inform Plaintiff that she would face disciplinary action on her return. (*Id.*)

Based on the prior performance and disciplinary issues related to Plaintiff's employment, and her clear insubordination regarding attending the trial in Kalamazoo, Ms. MacReady consulted Safe Horizons' corporate counsel, Sarah Prout, about terminating Plaintiff. On April 21, 2009, Ms. MacReady and Ms. Prout met with Plaintiff and terminated her employment. (*Id.* ¶ 5(h).) Ms. MacReady states that Plaintiff's race and/or religion played no part in her decision to terminate Plaintiff's employment.

## II. STANDARD OF REVIEW

Summary judgment is only appropriate if there are no genuine issues of material fact and the

8

moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Henderson v. Walled Lake Consol. Schs.*, 469 F.3d 479, 487 (6th Cir. 2006) ("A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."). When applying this standard, courts must view all materials, including all of the pleadings, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). *See also Sagan v. United States, et al.*, 342 F.3d 493, 497 (6th Cir. 2003) ( "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.") (citing *Matsushita*, 475 U.S. at 587).

The moving party bears the responsibility of establishing no issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *Id.* at 324. The non-moving party must do more than show that there is some abstract doubt as to the material facts. It must present significant probative evidence that the issue exists in order to defeat a motion for summary judgment. *See Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

### III. ANALYSIS

#### A. Discrimination Under Title VII And The ELCRA

Plaintiff's Complaint alleges that she was "being harassed by [her] immediate supervisor (not race or religious based) [which Plaintiff] brought [] to the attention of Executive Director Jenny

9

Shultz [sic] [MacReady] and in the conversation Ms. Shultz learned of [Plaintiff's] religion and made a negative comment about my race and religion and her attitude and [sic] change completely from that day on." (Compl. ¶ 9.) Plaintiff does not complain that any of the "nitpicking" by Ms. Berry was motivated by a discriminatory purpose. She testified at her deposition solely to the claimed facial expressions of Ms. MacReady, allegedly displayed in reaction to learning that Plaintiff was a Muslim, to support her Title VII claim.[2]

Both Title VII and the Elliot-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101 *et seq.*, prohibit an employer from discriminating against an employee with respect to compensation, terms, conditions, or privileges of employment based on that individual's religion. *See* 42 U.S.C. § 2000e-2(a)(1); Mich. Comp. Laws. § 37.2202(a). Courts use the same burden-

---

[2] Although Plaintiff check-marked the box for "race" on her Title VII Complaint, and claims in her response (p. 6,7) that she was the only full-time black employee at Safe Horizons (a claim never substantiated) it is clear from her deposition that the only alleged instance of discrimination about which she complains is religion, and not race related. In her deposition, Plaintiff stated that she alleged "religion discrimination and the EEOC added race to the case . . . The EEOC added race . . . but I personally believed that it was mostly my religion that rubbed [Ms. MacReady] the wrong way." (Def.'s Mot. Ex. A, Shabazz Dep. 82:18-83:12.) Although Plaintiff went on to state that the religious claim had a "racial charge," and that she was a "black woman," this claim was never substantiated through any of the evidence presented in connection with the instant motion. In fact, examples that Plaintiff gave of instances where she felt she was the object of racial discrimination had nothing to do with her employment at Safe Horizons.

At oral argument on this matter, Plaintiff confirmed that it was the EEOC that suggested that she add race to her claim. Contrary to her statement in her deposition that her claim was religion based, and directly contradicting the express written declaration on her Complaint that her immediate supervisor's (Ms. Berry) alleged harassment was "not race or religious based," at oral argument Plaintiff suggested that race perhaps was also a factor, based on an alleged incident with Ms. Berry that Plaintiff disclosed to the Court for the first time at the hearing on Defendant's motion. While the Court could not discern a race-based claim from the incident with Ms. Berry described at oral argument, the Court must reject Plaintiff's effort to create a genuine issue of fact by now contradicting her earlier deposition testimony. *Reid*, 790 F.2d at 460 ("A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony."). Further, no affidavit was filed by Plaintiff. The Court declines to analyze this as a race discrimination case.

shifting analysis the United States Supreme Court articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to analyze claims brought pursuant to the ELCRA, and Title VII. *See, e.g., Curry v. SBC Commc'ns, Inc.*, 669 F. Supp. 2d 805, 824 (E.D. Mich. 2009); *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462 (2001) (applying *McDonnell Douglas* to discrimination claim under the ELCRA). Accordingly, both of Plaintiff's discrimination claims will be analyzed under the same legal rubric.

"To assert a successful claim of religious discrimination under Title VII, a plaintiff must either present direct evidence of discrimination or, in the absence of direct evidence, present a prima facie case of indirect discrimination by showing (1) that [she] was a member of a protected class, (2) that [she] experienced an adverse employment action, (3) that [she] was qualified for the position, and (4) that [she] was replaced by a person outside of the protected class or that [she] was treated differently than similarly situated employees." *Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (2000) and *McDonnell Douglas, supra*, 411 U.S. at 802.)

"'[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Tepper*, 505 F.3d at 516 (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)). "Evidence of discrimination is not considered direct evidence unless [an improper] motivation is explicitly expressed." *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006). In the instant case, while Plaintiff claims in her Complaint that Ms. Schultz [MacReady] made a derogatory remark, Plaintiff has presented no evidence to substantiate this claim. In her deposition, Plaintiff could not recall any statements made by Ms. MacReady and testified that Plaintiff inferred Ms. MacReady's discriminatory intent from

11

a "disgusted look" that Ms. MacReady allegedly displayed on her face when Plaintiff disclosed that she was of the Muslim faith. Plaintiff has not presented any evidence of direct discrimination.

Because she has no direct evidence of religious discrimination, Plaintiff has the burden of establishing an inferential case of discrimination under *McDonnell Douglas*. *Tepper*, 505 F.3d at 515, 516 . Under the *McDonnell Douglas* test, which was clarified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), the plaintiff must first prove a *prima facie* case of discrimination. *Burdine*, 450 U.S. at 252-53; *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 342 (6th Cir. 1998). If the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse action. *Burdine*, 450 U.S. at 252-53 (quoting *McDonnell Douglas*, 411 U.S. at 802). If the defendant is able to articulate a legitimate reason, the burden then shifts back to the plaintiff to provide evidence that the given explanation was merely a pretext for unlawful discrimination. *Id.* at 256.

### B. The *Prima Facie* Case

A plaintiff establishes a *prima facie* case of discrimination by demonstrating that "'(1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was replaced by a person outside of the protected class.'" *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (quoting *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003)). The fourth prong can also be satisfied by showing that the plaintiff was treated differently than similarly situated employees who did not belong to the protected class. *Id.* (quoting *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001)).

Defendant claims that Plaintiff cannot establish a *prima facie* case of discrimination because there is no evidence that similarly situated non-Muslim employees were treated differently by Safe

12

Horizons. To establish that similarly situated employees were treated differently, Plaintiff must compare herself to a co-worker who has the same supervisor, is subject to the same standards of performance, and who engaged in nearly identical conduct in materially indistinguishable circumstances. "'The individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without differentiating or mitigating circumstances that would distinguish their conduct of the employer's treatment of them for it.'" *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116 (6th Cir. 2001) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Because Plaintiff has not offered any evidence of Safe Horizons' treatment of any other employee, let alone one who is similarly situated, she has failed to establish a *prima facie* case of discrimination.[3]

### C. Safe Horizons' Legitimate, Non-Discriminatory Reason

Even assuming that Plaintiff could establish a *prima facie* case of religious discrimination, this only shifts the burden to Safe Horizons to state a "legitimate, nondiscriminatory reason" for the adverse action. *Burdine*, 450 U.S. at 252-53 (quoting *McDonnell Douglas*, 411 U.S. at 802). Safe Horizons has satisfied this burden by producing extensive evidence, through Ms. MacReady's Affidavit and Plaintiff's deposition, of multiple issues with Plaintiff's poor performance and insubordination. Plaintiff admits that she received, indeed she acknowledged by signing, a copy of

---

[3] Defendant does not address a claim that the fourth prong can be satisfied by evidence that Plaintiff was replaced by someone outside the protected class, i.e. a non-Muslim. However, Plaintiff did not make such a claim in her Complaint or at her deposition and in fact gives no information whatsoever about the religious affiliation of the person who replaced her. Even assuming that Plaintiff was replaced by a non-Muslim, however, her claim still fails because Safe Horizons has articulated a legitimate business reason for Plaintiff's termination, which Plaintiff has failed to rebut.

her Performance Evaluation. Moreover, Plaintiff acknowledges that she was inappropriate and disrespectful to a co-worker, that her files were the cause of a significant issue related to an agency audit, and that she was made aware that she was not authorized to travel to Kalamazoo to attend a trial and that she failed to follow instructions from Ms. MacReady to find a local substitute in a timely manner. Safe Horizons has met its burden of producing evidence of a legitimate, non-discriminatory reason for Plaintiff's termination.

### D.   Plaintiff's Proof of Pretext

Despite Defendant's non-discriminatory reason for terminating Plaintiff, she can still survive summary dismissal of her discrimination claim if she can demonstrate that Defendant's reasons were merely a pretext. *Burdine*, 450 U.S. at 256. "An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 883 (6th Cir.1996). In challenging an employer's action, an employee 'must demonstrate that the employer's reasons (*each of them*, if the reasons independently caused [the] employer to take the action it did) are not true.'" *Smith v. Chrysler*, 155 F.3d 799, 805-06 (6th Cir. 1998) (quoting *Kariotis, supra*, 131 F.3d at 676 (emphasis in original).

The plaintiff will not meet this burden by merely demonstrating that the stated reason was pretextual. Rather, the employee must prove that it was a pretext for unlawful discrimination. *Hazle*, 464 Mich. at 465-66. It is insufficient to simply show that the employer's decision was wrong or mistaken, because the factual dispute is whether discriminatory animus motivated the employer not whether the employer is "wise, shrewd, prudent, or competent." *Id.* at 476; *see also Comiskey v. Auto. Indus. Action Group*, 40 F. Supp. 2d 877, 896 (E.D. Mich. 1999) ("[T]he question

is not whether the employer's reasons are *right*, but whether the employer's description of its reasons is *honest*.") (quoting *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997)) (emphasis in original); *Smith*, 155 F.3d at 806–07 (plaintiff must put forth evidence which demonstrates that the employer did not "honestly believe" in the proffered non-discriminatory reasons for its action). To avoid summary judgment, the plaintiff must establish a genuine issue of material fact as to whether the employer's proffered reason was a pretext. *Hazle*, 464 Mich. at 465 n.10.

In the instant case, Defendant terminated Plaintiff's employment due to a history of failing to follow her supervisor's directives (insubordination), inappropriate conduct toward co-workers, and disregard for Safe Horizons' financial interests and reputation. In large measure, Defendant's legitimate, non-discriminatory reasons for terminating Plaintiff are corroborated by Plaintiff's own testimony. Plaintiff admits that she was aware that she would be disciplined for the Kalamazoo trial incident. Moreover, Plaintiff concedes that she disregarded many of Ms. Berry's directives because Plaintiff decided that they were just "nitpicking," and thought her own way of handling matters was better. Plaintiff was informed by Safe Horizons on more than one occasion that it was not her place to substitute her judgment for that of her supervisor. It is undisputed that in November, 2008, Plaintiff was warned in writing and in person that her files and record keeping methods were deficient and that her habit of being "dismissive of her supervisor's expectations" and "argumentative with her supervisor" was unacceptable. Plaintiff does not dispute that in February, 2009, the continued deficiencies of her files caused the postponement of an audit by the agency's largest funding arm and that her insubordinate behavior created a significant issue between Safe Horizons and the Genesee County prosecutor.

While Plaintiff dismisses Safe Horizons' reasons for her termination as "nitpicking," there is no dispute that Safe Horizons honestly held the belief that Plaintiff was performing poorly and behaving in an insubordinate manner. Plaintiff has produced no evidence that Safe Horizons' legitimate, non-discriminatory reasons for terminating her lacked a basis in fact, did not actually motivate the decision, or were never used before to terminate an employee. Nor has Plaintiff produced any evidence that, even if pretextual, the proffered reasons were actually motivated by discriminatory animus based on Plaintiff's religion. In fact, the majority of Plaintiff's complaints about "nitpicking" and unreasonable demands are leveled at Ms. Berry, against whom Plaintiff makes no charge whatsoever of discriminatory conduct. Plaintiff bases her entire discrimination claim on her interpretation of a facial expression allegedly made by her supervisor's supervisor in a single meeting held to discuss serious deficiencies in Plaintiff's performance. Plaintiff has not presented sufficient evidence to create a genuine issue of material fact that the reasons given by Safe Horizons for Plaintiff's termination were merely a pretext for a discriminatory motive based on Plaintiff's religion.[4]

---

[4] Plaintiff did not provide an affidavit or other sworn declaration in support of her response to Defendant's motion for summary judgment. Nor did Plaintiff conduct any discovery in this case, although the discovery cut-off date was extended 90-days to accommodate Plaintiff. (Dkt. No. 19.) At two hearings before Magistrate Judge Randon on discovery-related matters, Plaintiff was directly questioned by Magistrate Judge Randon as to whether she believed she had sufficient evidence to adequately respond to the Defendant's motion for summary judgment. On two separate occasions Plaintiff responded, without qualification, that yes, she did have sufficient information to respond to the motion, despite also expressing a desire to conduct further discovery. *See* Hr'g Transcript, April 12, 2011 at 8, 10; Hr'g Transcript, May 17, 2011 at 5. Plaintiff's unequivocal representation to the Court, at two separate hearings, that she was satisfied with her response to Defendant's motion for summary judgment and that she believed she had sufficient information to adequately prepare her defense to the motion, indicates to the Court that Plaintiff had all of the facts she believed were essential to justify her opposition to Defendant's motion.

16

## IV. CONCLUSION

Viewing the facts in the light most favorable to Plaintiff, and drawing all reasonable inferences in her favor, it appears that Plaintiff was passionate about her role as a court advocate for victims of domestic abuse at this grant-funded agency, but she does not deny that she was dismissive of her supervisor's directives, deficient in her record keeping habits and had difficulties on occasion appropriately interacting with colleagues. On more than one occasion, Plaintiff's decision to ignore her supervisor's instructions, and to perform her job according to her own rules, resulted in poor performance reviews, embarrassment of her employer and disciplinary action. Even assuming that Plaintiff was able to establish a *prima facie* case of discrimination, she has been wholly unable to provide significant probative evidence creating a genuine issue of material fact that Safe Horizons' legitimate business reason for terminating her employment was merely a pretext for religious discrimination. For these reasons, the Court GRANTS Defendant's motion for summary judgment (Dkt. No. 39) and DISMISSES Plaintiff's Complaint with prejudice.

IT IS SO ORDERED.

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: 9-13-11